IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


THE CONNECTICUT LIGHT AND POWER
COMPANY, d/b/a EVERSOURCE ENERGY,
      Plaintiff


v.                              Civil Action No. 3:14-cv-1152-SRU


VERIZON NEW YORK, INC.,
      Defendant


**DEFENDANT, VERIZON NEW YORK, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**


**INTRODUCTION**

This matter has its genesis in an accident that occurred on January 30, 2012. A commercial flatbed truck with a mounted drilling apparatus was traveling south on Riversville Road intending to make a right turn onto westbound Sherwood Avenue in Greenwich, Connecticut. As the driver negotiated his turn, the mounted drilling apparatus snagged a wire, spanning across the roadway from east to west between utility poles. The truck continued to make the turn, pulling the wires that stressed the pole number 69171 located at the northeast corner of Riversville Road ultimately causing the pole to fracture.

As a result of this accident the Plaintiff filed a two (2) count Breach of Contract claim against Verizon New York, Inc. (hereinafter, Verizon) seeking to recover only for damages to its own equipment and attachments to the utility poles. In count II of the


**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

Amended Complaint, the Plaintiff seeks indemnification premised upon a " joint pole agreement " between the parties. [1]

The terms of the joint pole agreement are not in dispute and can be applied as a matter of law to the allegations in the Amended Complaint.

Verizon is entitled to summary judgment for the following reasons:

- The " joint pole agreement" upon which the Complaint is premised does not provide for contractual indemnification between the parties with respect to damage to their property. Indeed, the joint pole agreement specifically states 'Each party shall ….repair **at its own expense**, its own wires, fixtures and appurtenances on all JOINTLY     OWNED     poles     covered     by     this AGREEMENT. All that is required to decide this issue as matter of law is to examine the allegations in the complaint, compare them to the "joint pole agreement" and apply standard principles of contract law.

- The Plaintiff's breach of contract claim is nothing more than a negligence claim which is barred by the statute of limitations.

- Regardless of the theory of liability, contract or negligence, there is no evidence, beyond guess and speculation, that Verizon was legally responsible for this incident.

- The Plaintiff cannot substantiate its allegations where it has not provided expert evidence in support of its claims.

Undisputed Material Facts:

1. On January 30, 2012, Aaron Nachbar ("Mr. Nachbar") was operating a 2002 T4W Ingersoll Rand vehicle with a water well drill mounted on a crane carrier chassis. *See* **EXHIBIT A**, Deposition Transcript of Aaron Nachbar, p. 8.

2. The height dimension of the vehicle Mr. Nachbar was operating was twelve (12) feet, four (4) inches high. *See* **EXHIBIT A**, p. 9.

---

[1] There are no negligence claims asserted against Verizon. This action was commenced after the two (2) year statute of limitation for negligence had passed.

2

3. Mr. Nachbar was traveling from New Canaan to Sherwood Avenue to drill a well. *See* **EXHIBIT A**, p. 13.

4. At approximately 9 AM, Mr. Nachbar made a right-hand turn off of Riversville Road onto Sherwood Avenue. *See* **EXHIBIT A**, p. 15.

5. The top edge of the small winch on the drill rig truck operated by Mr. Nachbar caught the wires above him. *See* **EXHIBIT A**, pp. 18, 25.

6. One week before the accident's occurrence, Mr. Nachbar drove down Riversville Road for a pre-trip inspection to make sure the job site was accessible, that nothing was in the way for him to drill a well, and that the road had clear access to the site. *See* **EXHIBIT A**, pp. 43-44.

7. Mr. Nachbar testified that a specific part of his pre-trip inspection and "looking around" was to be sure there were no low-hanging wires in the area and that the wires in the area were of sufficient height so the drilling truck could clear the intersection. *See* **EXHIBIT A**, pp. 44-45, 77.

8. Mr. Nachbar had experience before this accident with such pre-trip inspections. *See* **EXHIBIT A**, p. 44.

9. Mr. Nachbar did not notice anything abnormal about the specific pole that his truck caught the wires of during his pre-trip inspection. *See* **EXHIBIT A**, p. 36.

10. Based upon his observations at the scene, Mr. Nachbar stated he "did not see anything" that would indicate why the wires came to be low that hit his truck. *See* **EXHIBIT A**, p. 37.

11. Based upon the pre-trip inspection, Mr. Nachbar testified it was his observation that the wires were of sufficient height. *See* **EXHIBIT A**, p. 45.

12. Mr. Nachbar testified that just before the accident, he did not see any problems with the wires or anything in his view. *See* **EXHIBIT A**, p. 52.

13. Mr. Nachbar testified it was possible that something happened to the wires between the week of his pre-trip inspection and the day of the accident that would have caused them to hang low. *See* **EXHIBIT A**, p. 82.

14. Plaintiff, Connecticut Light and Power Company ("CL&P"), admitted that it could not locate any documents in its possession, custody, or control indicating that Verizon had notice of any damage, defective condition, or disrepair, to "Pole 69171" prior to the accident. *See* **EXHIBIT D**, Plaintiff The Connecticut Light & Power Company's Supplement/Revised Responses to Defendant, Verizon New York, Inc.'s First Request for Admissions, Responses Nos. 1 & 2.

15. Plaintiff, CL&P, admitted it lacked the knowledge or information sufficient to respond as to whether or not, prior to the alleged loss, there was any evidence that "Pole 69171" was defective or in disrepair. *See* **EXHIBIT D**, Response No. 8.

16. Kevin Patterson and Sean Perna, two journeyman lineman employed by CL&P at the time of the incident, were in a boom truck that showed up on scene shortly after the incident's occurrence. *See* **EXHIBIT B**, Deposition Transcript of Kevin Patterson, p. 13-14.

17. The boom truck operated by Kevin Patterson and Sean Perna was approximately eleven (11) feet, eleven (11) inches in height. *See* **EXHIBIT C,** Deposition Transcript of Sean Perna, p. 33.

18. Sean Perna ("Mr. Perna"), a CL&P journeyman/lineman, had prior training with respect to maintaining safety on electrical wires. *See* **EXHIBIT C**, p. 11.

19. Mr. Perna worked out of a garage building in Greenwich, Connecticut located at 330 Railroad Avenue from May of 2007 to December 2014. *See* **EXHIBIT C**, p. 12.

20. Mr. Perna was familiar with the area at the intersection at Riversville Road and Sherwood Avenue where the accident happened, and had driven down Riversville Road "quite a few" times. *See* **EXHIBIT C**, pp. 12-13.

21. Riversville Road is open to truck traffic and there are no restrictions on that road with respect to truck traffic. *See* **EXHIBIT C**, p. 13.

22. Mr. Perna previously worked on low-hanging electrical wires for storm-related trouble calls. *See* **EXHIBIT C**, pp. 14-15.

23. Mr. Perna testified that wires may come down due to natural causes, such as a tree falling on them. *See* **EXHIBIT C**, p. 15.

24. Mr. Perna and Mr. Patterson were in the same vehicle on the date of the alleged accident, and drove by the scene of the alleged accident earlier that morning. *See* **EXHIBIT C**, p. 17.

25. Upon driving by the scene of the alleged accident earlier that morning, the boom truck Mr. Perna and Mr. Patterson were in travelled underneath and cleared the wires above the intersection. *See* **EXHIBIT C**, p. 17.

26. Mr. Perna testified he did not recall any problems with the wires at the intersection of Riversville Road and Sherwood Avenue when he drove by it earlier that morning. *See* **EXHIBIT C**, pp. 18, 32.

27. Mr. Perna testified that he did not see any low-hanging wires at the intersection, and that he would have reported them if he did see them. *See* **EXHIBIT C**, pp. 18-19.

28. Mr. Perna testified that he did not know what caused the alleged accident. *See* **EXHIBIT C**, p. 32.

29. Mr. Perna testified that there was no defective condition in any of the wires that caused the alleged accident. *See* **EXHIBIT C**, p. 32.

30. Mr. Perna testified that he did not have any explanation as to why the wires may have dropped by the time after he passed through the intersection at the time of the accident. *See* **EXHIBIT C**, p. 37.

31. Mr. Perna testified he did not know whether the wires were low or the truck was higher or if there were any other problems with the attachments. *See* **EXHIBIT C**, pp. 37, 41-42.

32. Mr. Perna testified that he could not recall if there were any problems with the communication wires. *See* **EXHIBIT C**, p. 41.

33. Mr. Perna testified that he would notice a wire if it was within a couple inches of the boom truck. *See* **EXHIBIT C**, p. 47.

34. Mr. Perna testified that "I would notice something laying right across the road in my line of sight, in view of my windshield, higher than the height of the truck." *See* **EXHIBIT C**, p. 47.

35. Kevin Patterson ("Mr. Patterson"), a CL&P employee, was also a certified journeyman/lineman. *See* **EXHIBIT C**, pp. 9, 10, 11.

36. Mr. Patterson had training in "troubleshooting," which he described as "ways to find faults on lines." *See* **EXHIBIT B**, p. 11.

37. Mr. Patterson performed work out of a building in Greenwich, Connecticut, located at 330 Railroad Avenue, which is approximately six (6) to seven (7) miles from the accident scene. *See* **EXHIBIT B**, p. 12.

38. Mr. Patterson travelled through the intersection at Riversville Road and Sherwood Avenue, where the accident happened, anywhere from once per week to once per month and was familiar with the intersection. *See* **EXHIBIT B**, p. 12.

39. Mr. Patterson testified that he did not know how the wires came to be in contact with the truck involved in the accident. *See* **EXHIBIT B**, p. 33.

40. Mr. Patterson testified that he did not know whether the boom on the truck was too high or the wires were too low. *See* **EXHIBIT B**, p. 33.

41. Mr. Patterson had prior experience working on low-hanging wires in other areas. *See* **EXHIBIT B**, pp. 34, 39-40.

42. Mr. Patterson stated that a low-hanging wire at an intersection, as well as a "huge" communication wire that was "really, really low" would be considered a safety hazard. *See* **EXHIBIT B**, p. 38.

43. During his prior visit to the intersection between one week and one month prior to the accident, Mr. Patterson did not see any lower hanging wires that he thought posed a safety concern. *See* **EXHIBIT B**, p. 38.

44. Mr. Patterson testified that natural causes, such as a tree coming down, may cause low hanging wires on a power line. *See* **EXHIBIT B**, p. 40.

45. Mr. Patterson testified that the presence of low hanging wires on a power line does not mean they were not maintained in good condition. *See* **EXHIBIT B**, p. 40.

46. Mr. Patterson testified that if he saw something that was hazardous to the safety of the community, he would report it. *See* **EXHIBIT B**, pp. 36-37, 47.

47. Mr. Patterson never saw a dangerous condition during the time he worked in the area near the accident site prior to its occurrence. *See* **EXHIBIT B**, p. 47.

48. Rafael Quintero ("Mr. Quintero") is a Multiple Dwelling Unit ("MDU") FiOS account manager for Verizon. *See* **EXHIBIT E**, Deposition Transcript of Rafael Quintero, p. 6.

49. Mr. Quintero testified that cases involving damage happen on a regular basis and for various reasons, such as car accidents leading to broken poles, storms, broken trees, and hit cables. *See* **EXHIBIT E**, pp. 100-101.

50. Mr. Quintero has twenty-seven (27) years and nine (9) months of experience working for Verizon. *See* **EXHIBIT E**, p. 101.

51. Mr. Quintero testified that there are many reasons why wires may become low over time, including damage to another pole that causes a second pole to lean inwards. *See* **EXHIBIT E**, p. 102.

8

52. Mr. Quintero did not specifically state why the wires were hanging low, but that it was possible another company attached something else to the same pole, over-tightened the attachments, and caused the pole to lean inward, which would lead to low-hanging wires. *See* **EXHIBIT E**, p. 102.

53. Bryan Hocking ("Mr. Hocking") is an outside plant engineer, or design specialist, for Verizon.  *See* **EXHIBIT F**, Deposition Transcript of Bryan Hocking, p. 7.

54. Mr. Hocking has forty-seven (47) years of experience working for Verizon, including previously doing field work as a splicer. *See* **EXHIBIT F**, p. 124.

55. Mr. Hocking identified that a tree falling on cable wires may cause them to sag lower than where they were originally installed. *See* **EXHIBIT F**, p. 125.

56. Mr. Hocking also testified that wires may sag lower if additional cables are added to the same strand, causing the sag to increase. *See* **EXHIBIT F**, p. 125.

57. Mr. Hocking testified that wires may sag lower if either of the telephone poles leans on either end. *See* **EXHIBIT F**, p. 125.

## THE AMENDED COMPLAINT:

CL&P's First Amended Complaint alleges in pertinent part:

*Verizon and CL&P jointly own certainly utility poles within the Town of Greenwich.* See **EXHIBIT G**, CL&P's First Amended Complaint and Jury Demand, ¶7

*CL&P and Verizon are parties to a certain agreement entitled "Agreement Between The Connecticut Light and Power Company and the New York Telephone Company Covering the Joint Use of Poles"...(hereinafter referred to as the "Joint Pole Agreement").* See **EXHIBIT G**, ¶8

*The Joint Pole Agreement, among other things, governs the parties' respective rights and responsibilities with regard to utility poles jointly owned or used by both the parties as well as their respective attachments to said utility poles. See* **EXHIBIT G**, ¶9

*Among other things, the Joint Pole Agreement provides that each party's construction associated with jointly owned poles must comply with certain Connecticut regulations and provides further that "Each party shall maintain in good order and repair at its own expense, its own wires, fixtures and appurtenances on all JOINTLY OWNED poles covered by this Agreement." See* **EXHIBIT G**, ¶10

*The Joint Pole Agreement also allocates between the parties the responsibility to inspect and maintain poles by geographical region. Specifically, the Joint Pole Agreement assigns a territory for each company to serve as pole "Custodian." As pole "Custodian," the designated company is responsible "for the inspection, condition and maintenance of ' jointly owned poles within that territory. The Joint Pole Agreement further provides that the pole custodian "shall arrange to have all JOINTLY OWNED POLES, guys and pole braces in its custody inspected at mutually agreed intervals ... " See* **EXHIBIT G**, ¶11

*The Joint Pole Agreement contains provisions governing the process of replacing jointly owned poles. The Joint Pole Agreement provides that a party which replaces a jointly owned pole, must mail a Transfer Notice upon completion of the installation of the new pole. The other party must then return the Transfer Notice to the originating party once it has transferred its attachments to the replacement pole. See* **EXHIBIT G**, ¶12

*With respect to such pole replacements, the Joint Pole Agreement further provides as follows:*

> *If either party has removed its ATTACHMENTS from a pole in connection with a replacement or relocation, and a period of ninety (90) days has elapsed from the date of a Transfer Notice, executed and mailed as provided in Paragraph 3 of Appendix V, the remaining party shall thereafter indemnify and save harmless the vacating party for and from all obligation, liability, damages, costs, expenses or other charges incurred at any time thereafter because of or arising out of the presence, location or condition of such pole or of any attachments of the remaining party thereon irrespective of any negligence on the part of the vacating party arising out of any previous joint ownership or JOINT USE of such pole. See* **EXHIBIT G**, ¶13

10

*Verizon had various cables and wires attached to Pole #69171. Some of Verizon's cables and wires hung perpendicularly above and across Riversville Road and connected to another jointly owned pole located off the paved surface at the northwest corner of the intersection of Riversville Road, and Sherwood Avenue, known by CL&P as Pole #71679 and Verizon as "Pole #1". See* **EXHIBIT G**, ¶16

*Verizon was the designated pole Custodian for both Pole #69171 and Pole #71679. See* **EXHIBIT G**, ¶17

*The unlawfully low height of Verizon's wires constituted a breach of the Joint Pole Agreement and was the result of Verizon 's breach of its contractual obligations to (1) inspect and maintain the poles, (2) install at a proper height and maintain in good order and repair at its own expense, its own wires, fixtures and appurtenances to said poles, and/or (3) its failure to transfer its wires to the replacement for Pole #71679. See* **EXHIBIT G**, ¶24

*Verizon and CL&P entered into the Joint Pole Agreement which required, among other things: (a) that Verizon install and maintain its attachments to Poles #69171 and #71679 in good order and repair and in accordance with certain Connecticut regulations, (b) that Verizon inspect and maintain Poles #71679 and #69171, and (c) that Verizon transfer its wires to a replacement pole after such a pole has been placed. See* **EXHIBIT G**, ¶31

*Verizon breached the Joint Pole Agreement by failing to install and maintain at a proper height and in good order and repair its wires and cables, by failing to inspect and maintain Poles #71679 and #69171, and by failing to transfer its wires and cables on Pole #71679 to the replacement pole. See* **EXHIBIT G**, ¶32

*As a result of Verizon's breach of its contractual obligations as aforesaid, damage was caused to CL&P's electrical distribution equipment. See* **EXHIBIT G**, ¶33

*CL&P mailed a Transfer Notice to Verizon on or before September 21, 2010, indicating that CL&P had replaced Pole #71679. See* **EXHIBIT G**, ¶36

*Verizon did not transfer its attachments on Pole #71679 to the replacement pole within ninety days of September 21, 2010. See* **EXHIBIT G**, ¶37

*The Joint Pole Agreement provides that Verizon must therefore indemnify and save harmless CL&P for and from all obligation, liability, damages, costs, expenses or other charges incurred at any time thereafter because of or arising out of the presence, location or condition of Pole #71679 or Verizon's attachments remaining on the old pole. See* **EXHIBIT G**, ¶38

11

*The accident on January 30, 2012, arose out of the presence, location or condition of Pole #71679 or Verizon's attachments remaining on the old pole.* See **EXHIBIT G**, ¶39

*Verizon must therefore indemnify and save CL&P harmless for and from all obligation, liability, damages, costs, expenses or other charges incurred as a result of the Accident.* See **EXHIBIT G**, ¶40

### The Joint Pole Agreement

The Joint Pole Agreement has a specific provision that provides for allocation of

liability between the parties.

Article IX

LIABILITY BETWEEN THE PARTIES

*"**Whenever liability** for damages for injuries to or death of persons other than employees Of either party or **for damages for injuries to property not belonging to either party arises out of the JOINT USE or joint ownership of poles, as provided for in this AGREEEMENT, the liability for such injuries or damage as between the parties hereto shall be as follows**:*

*A.    Each party shall be liable for one-half (1/2) of any damages for injuries to or death of persons other than employees of either party, and for one-half (1/2) of any damages for injury to property not belonging to either party, arising out of the location of a jointly used or owned pole, guy, anchor, guy stub or push brace (but not the ATTACHMENTS of either party) subject to the provisions of paragraph E of this Article.*

*B.    Except as provided in paragraph A of this article, each party shall be liable for one-half (1/2) of any damages for injuries to or death of persons other than employees of either party, and for one-half (1/2) of any damages for injury to property not belonging to either party, arising out of the JOINT USE or joint ownership of poles and ATTACHMENTS which are the subject of this AGREEMENT, provided however, that in the even such damages are the result of (1) the sole negligence of either party or (2) the result of negligence of only one party jointly with that of a stranger to this agreement, or (3) the result of the active or primary negligence of one party and only passive or secondary negligence of the other, then the sharing of liability provided for herein shall not be effective and the party who is solely negligent, jointly negligent with a stranger or primarily negligent as set forth in (1), (2) and (3) above, shall*

12

*assume, as between the parties hereto, full responsibility for any liability arising from such negligence.*

*E.    If either party has removed its ATTACHMENTS from a pole in connection with a replacement or relocation, and a period of ninety (90) days has elapsed form the date of a Transfer Notice, executed and mailed as provided in Paragraph 3 of Appendix V, the remaining party shall thereafter indemnify and save harmless the vacating party for and from all obligation, liability, damages, costs, expenses or other charges incurred at any time thereafter because of or arising out of the presence, location or condition of such pole or of any ATTACHMENTS of the remaining party thereon irrespective of any negligence on the part of the vacating party arising out of any previous joint ownership or JOINT USE of such pole.*

See **EXHIBIT H,** attached hereto, Joint Pole Agreement (Emphasis Supplied).

The Joint Pole Agreement further provides:

APPENDIX VI- DIVISION OF MAINTENANCE COSTS OF JOINTLY OWNED POLES

*6.    Each party shall maintain in good order **and repair at its own expense**, its own wires, fixtures and appurtenances on all JOINTLY OWNED poles covered by this AGREEMENT.  All work done on any JOINTLY OWNED poles or on any attachment thereon shall be performed in a manner which will not unduly interfere with the service, wires, fixtures and appurtenances of the other party hereto.*

See **EXHIBIT H**, attached hereto, Joint Pole Agreement.

**GENERAL PRINCIPLES OF CONTRACT INTERPRETATION**

When analyzing a contract under Connecticut law, this Court must look at the contract as a whole and give operative effect to all of its provisions. The Court's analysis must focus on the intention of the parties, as discerned from the language that they employed. Where the intent of the parties is clear and unambiguous from the language that the parties employed, the Court must give effect to that intent. Language in a contract is unambiguous if "it has a 'definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . ." *Id.* (citations omitted). As a general matter, parties are bound by unambiguous language in a written contract regardless of whether they actually read or understand that language when they sign it.

See DaimlerChrysler Ins. Co. v. Pambianchi, 762 F. Supp. 2d 410, 420 (D. Conn. 2011).

"In construing contracts, [the Court] gives effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous"—and a fortiori militates against interprets provision of a contract provision in such a way as to render its application invalid.

***

"A contract must be construed as a whole and the intention of the parties is to be ascertained from the entire instrument. The contract's meaning must be gathered from the entire context and not from particular words, phrases, or clauses or from detached or isolated portion of the contract. All the words in a contract are to be considered in determining its meaning, and the entire contract in all of its parts should be read and treated together. The entire agreement is to be considered to determine the meaning of the part."

See Suburban Props., LLC v. Coppelman, No. NNHCV095032489S, 2013 Conn. Super. LEXIS 2993, at *22-*24 (Super. Ct. Dec. 27, 2013)

"[There is], a presumption that the language is definitive arises when . . . the contract is between sophisticated parties and commercial in nature. . . . [The Court's] review, in such a case, is plenary." (Citations omitted.) Best Friends Pet Care, Inc. v. Design Learned, Inc., 77 Conn. App. 167, 176, 823 A.2d 329 (2003).

See O & G Indus. v. All Phase Enters., 112 Conn. App. 511, 518, 963 A.2d 676, 681, 2009 Conn. App. LEXIS 46, *7 (Conn. App. Ct. 2009); United Illuminating Co. v. Wisvest-Connecticut, L.L.C., 259 Conn. 665, 670, 791 A.2d 546, 549-550, 2002 Conn. LEXIS 100, *8-9 (Conn. 2002)

The joint pole agreement is interpreted in accordance with "the latin maxim of expressio unius est exclusio alterius or "the expression of one thing is the exclusion of another." Long a staple of our statutory interpretation, this court also has applied the principle to contractual agreements. See Biro v. Matz, 132 Conn. App. 272, 282, 33 A.3d 742, 750, 2011 Conn. App. LEXIS 570, *14-15 (Conn. App. Ct. 2011); Best Friends Pet Care, Inc. v. Design Learned, Inc., 77 Conn. App. 167, 179-80, 823 A.2d 329 (2003)

[The Court] is to interpret contract language in accordance with a fair and reasonable construction of the written words given their common, natural and ordinary meaning when we can sensibly do so. Southington v. Commercial Union Ins. Co., 71 Conn. App. 715, 725-26, 805 A.2d 76 (2002).

See Best Friends Pet Care, Inc. v. Design Learned, Inc., 77 Conn. App. 167, 182, 823 A.2d 329, 338, 2003 Conn. App. LEXIS 243, *24 (Conn. App. Ct. 2003)

Where, as here, the contract does not "exclusively or unequivocally refer[] to claims between the parties themselves," (Internal Citations Omitted)[the Court] will presume that indemnification extends only to third-party] disputes.

14

Bank of N.Y. Trust Co. v. Franklin Advisers, Inc., 726 F.3d 269, 283 (2d Cir. 2013)

## ARGUMENT

Article IX of the joint pole agreement, entitled "Liability Between the Parties", specifically delineates how CL&P and Verizon are to address their respective liabilities when there is an incident involving a jointly owned pole.

Article IX, demonstrates that the parties were aware that there would be incidents involving jointly owned poles. In response they drafted a specific provision to address the issue.

Article IX only applies to claims presented by third parties.

Conspicuously absent from joint pole agreement is an allocation of liability for claims between the parties, or a specific contractual provision for indemnification when there is damage to the parties, CL&P and Verizon's respective equipment.

Two sophisticated commercial entities, such as a CL&P and Verizon, could have easily drafted a clause to address that contingency, if they so desired. The absence of such provision consistent with the principle of expressio unius est exclusio alterius, demonstrates that the parties did not want to litigate claims involving damage to their own equipment. It would be commercially irresponsible for the parties to litigate these claims, which are generally minimal in nature, when there are literally millions of jointly owned poles.

Reading the joint pole agreement as a whole reveals a provision that the parties drafted to address the issue of repairing damage to the parties' respective equipment, regardless of the cause of the damage or who is responsible for the damage.

15

The Joint Pole Agreement provides in pertinent part:

APPENDIX VI- DIVISION OF MAINTENANCE COSTS OF
JOINTLY OWNED POLES

6. *Each party shall maintain in good order **and repair at its own expense**, its own wires, fixtures and appurtenances on all JOINTLY OWNED poles covered by this AGREEMENT.*

The clause is clear and unambiguous.[2]

The provision requiring each party to ***"repair at its own expense**, its own wires"* does not provide exceptions when the damage to be repaired is to due to the failure of either party.

Reading Article IX, "Liability Between the Parties," in conjunction with this provision, demonstrates that the parties made a conscious decision that each party to the agreement was responsible for the expense of repairing its own property, regardless of the cause or who may have been at fault for the damage.

To reiterate, two sophisticated business entities could have drafted an indemnification provision, or an apportionment of liability clause, to address these issues, but didn't. The absence of such a provision demonstrates an intent to eliminate litigation between the parties. It is also consistent with the fact there is no arbitration provision to resolve what are typically minor claims.

The Plaintiff at Paragraph 13 of its amended complaint relies upon Paragraph E of Article IX of the joint pole agreement, entitled "Liability Between the Parties," for the proposition that it is entitled to indemnification.

---

[2] The word repair is of common usage, meaning, "to restore to a good or sound condition after decay or damage; mend". "repair". Dictionary.com.2016. http://www.dictionary.com (25 Jan 2016)

As a matter of law this is incorrect. Article IX of the joint pole agreement unambiguously states that provision only applies to property damage claims for third parties, not CL&P or Verizon. Thus this provision is not applicable to this matter. [3]

## PLAINTIFF'S BREACH OF CONTRACT CLAIM IS NOTHING MORE THAN A NEGLIGENCE CLAIM

In Count I the Plaintiff alleges:

Verizon breached the Joint Pole Agreement by failing to install and maintain at a proper height and in good order and repair its wires and cables, by failing to inspect and maintain Poles #71679 and #69171, and by failing to transfer its wires and cables on Pole #71679 to the replacement pole. ¶32

Verizon is entitled to judgment as a matter of law on Plaintiff's breach of contract claim because the undisputed evidence shows that Plaintiff's breach of contract claim is really a negligence claim disguised as a contract count.

Courts have held that tort claims cloaked in contractual language are, as a matter of law, not breach of contract claims. Barnes v. Schlein 192 Conn. 732, 735 (1984) (Complaint founded in negligence because gravamn of suit was alleged failure by Defendant to meet the standard of care): Rumbin v. BA Easy, 52 Conn. App. 487, 491-92 (1999) ("An allegation of…malpractice does not generally give rise to a breach of contract claim"): DiMaggio v. Makover, 13 Conn. App. 321, 323 (1988) (Complaint founded in malpractice and absolutely barren of any allegation that the Defendant breached any contractual duty owned to Plaintiff): Shuster v. Buckley, 5 Conn. App. 4743, 478 (1985) (Complaint founded in tort, not contract). "Just as putting a constitutional tag on a non-constitutional tag will no more change its essential character

---

[3] In this particular action it is not necessary to decide whether the absence of a contractual provision would preclude a negligence action. Here, a negligence action is precluded as a matter of law.

than calling a bull a cow will never change its gender...Putting a contract contact tag on a tort claim will not change its essential character. And action in contract is for the breach of duty arising out of contracts: An action in tort is for a breach of duty imposed by law." Gazo v. City of Stamford, 255 Conn. 245, 263 (2001) (Internal quotation marks omitted). Plaintiff's breach of contract claim is exactly the type of count rejected by Connecticut Courts.

This matter arises out of an automobile accident which is a tort claim, not a breach of contract. This is not a contract claim where Verizon did not timely perform a contractual requirement or failed to deliver a product on time.

With respect to this property damage claim the joint pole agreement does not create any duties beyond those which exist at common law. This matter is controlled by well established principles of common law negligence.[4]

The damages sought in this matter are tort damages. CL&P is only seeking to recover property damage for its own equipment. As previously argued the joint pole agreement does not allow recovery for damages to CL&P's own property.

The usual recovery for a breach of a contract is the contract price or the lost profits therefrom or the difference between the contract price and the value of the property at the time of the breach of the contract. Gazo v. City of Stamford, 255 Conn. 245, 265, 765 A.2d 505, 516 (2001). As the Court in Gazo held.

> It is clear, therefore, that although the plaintiff has cast this claim in contractual language, in essence he seeks a tort recovery.
>
> ***
>
> The only practical difference between the plaintiff's negligence and

---

[4] Failing to timely assert a negligence claim materially prejudices Verizon by precluding Verizon from asserting a claim against the drilling company for its negligence.

contract claims is that different statutes of limitations would apply to the two claims. The law should not permit him to recast what is essentially a tort claim as a contract claim solely to gain the potential advantage of a longer statute of limitations.

Common sense also informs us that the plaintiff's contract claim is in reality his negligence claim cloaked in contract garb. "It is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." State v. Zayas, 195 Conn. 611, 620, 490 A.2d 68 (1985).

In sum, where, as in this case, the plaintiff's allegations of both liability and damages sound in tort, and the only practical effect of permitting a contract claim to lie would be to extend the tort statute of limitations, and common sense strongly counsels otherwise, the plaintiff may not be permitted to transform his tort claim into a contract claim merely by alleging that it is such a claim.

See Gazo, 255 Conn. at 266.

## VERIZON IS ENTITLED TO SUMMARY JUDGEMENT BECAUSE THE PLAINTIFF CANNOT PROVE THE ESSENTIAL ELEMENTS OF ITS CASE.

It is axiomatic that the plaintiff in a civil action bears the burden of proving all essential elements of the claim by a preponderance of the evidence. *See* Gulycz v. Stop and Shop, 615 A.2d 1087, cert. denied, 618 A.2d 529 (Conn. 1992). The burden is not on the defendant to disprove the plaintiff's claim. *See* Bember v. Am. Med. Response of CT, Inc., 2016 Conn. Super. LEXIS 2866, at *7,*8 (*quoting* Gulycz, 615 A.2d 1087, cert. denied, 618 A.2d 529 (Conn. 1992)) ("While the plaintiff is entitled to every favorable inference that may be legitimately drawn from the evidence...the plaintiff must still sustain the burden of proof on the contested issues in the complaint and the defendant need not present any evidence to contradict it..."); If the plaintiff fails to establish an essential element of his claim, then a finding must be directed in favor of the defendant. *See* Gulycz, 615 A.2d 11087, cert. denied, 618 A.2d 529 (Conn. 1992). Further, the mere happening of an incident does not justify the inference that the defendant did something

19

that caused injury to the plaintiff. *See* Alswanger v. Smego, 1999 Conn. Super. LEXIS 1052, at \*23, \*24 ("…the mere occurrence of an injury does not create the presumption negligence on the part of any person…"). In order to prevent the entry of judgment as a matter of law, plaintiff must produce competent, admissible evidence that the defendant did something or failed to do something, which was a proximate cause of the injury. Although proof of causation may be established by inference, the proof must be based on reasonable inferences drawn from the facts and evidence. *See* Curran v. Kroll, 2008 Conn. Super. LEXIS 522, at \*3 (*citing* Riccio v. Harbour Village Condominium Ass'n, Inc., 914 A.2d 529 (Conn. 2007)). A plaintiff may not rely on conjecture or speculation to establish causation. *See* Id., at \*3, \*5, \*10 (*citing* Winn v. Posades, 913 A.2d 407 (Conn. 2007)). Speculation cannot fill the void left by a lack of proof. *See* Id. at \*3.

While the Plaintiff is not bound to exclude every other possible cause for his injury except that of the defendant, it is required to prove the greater likelihood that the injury was caused by an act for which the Defendant is responsible, rather than from a cause for which the defendant is not liable. *See* Hicks v. State, 948 A.2d 982, 995 (Conn. 2008).

That chances "somewhat favor" the Defendant being the cause is not preponderant evidence. Much less would speculation as to possibilities be preponderant evidence. Lynch v. Merrell-National Laboratories, Div. of Richardson-Merrell, Inc., 830 F.2d 1190-1197 (1st Cir. Mass. 1987).

The mere occurrence of an accident, without more, does not warrant an inference that a defendant has been negligent or is legally responsible. *See* Alswanger v. Smego, 1999 Conn. Super. LEXIS 1052, at \*23, \*24.

There is no evidence that there was a defect in the wires attributable to Verizon which caused the accident. There is no evidence that Verizon ever received notice of any problem or concern with the wires on the poles where the incident occurred. There is no evidence that prior to the accident there were any problems or concerns with the wires on the poles where the incident occurred.

The driver of the truck involved in the accident looked and did not see any problem with the wires. Two (2) CL&P journeymen linemen, who were familiar with issues involving low hanging wires, drove through the intersection in a boom truck on the morning of the accident and did not see any problems with the wires. These same two CL&P linemen were at the scene of the accident within minutes of the accident. They assisted in freeing the drilling rig from the wires. Again they did not notice any defect in the Verizon wires. It is undisputed that utility wires can sag for a multitude of reasons having nothing to do with the maintenance of the equipment.

In order to demonstrate liability on the basis of circumstantial evidence, the Plaintff must negate the other possible causes for which the defendant would not be responsible in order to raise a reasonable inference of a defect.

*See* Hirschbeck v. Wright Med. Tech., Inc., No. CV055000410S, 2011 Conn. Super. LEXIS 416, at *22 (Super. Ct. Feb. 18, 2011).

## THE PLAINTIFF CANNOT SUBSTANTIATE ALLEGATIONS OF A DEFECT WHERE IT HAS NOT PROVIDED EXPERT EVIDENCE IN SUPPORT OF ITS CLAIMS

Here there is no tangible, or direct evidence, to establish a defect attributable to Verizon, nor is there any evidence that a reasonable inspection program would have discovered a defect.

21

This is not a situation where the Plaintiff is identifying a specific Verizon piece of equipment and identifying a defect which a lay person would comprehend, such as a broken bolt or a rotted wire. Nor is this a situation where there is evidence that a problem existed for a certain period of time and, an inspection program would have discovered the defect.

There is a unique factual issue specific to this matter, which differentiates it from other low hanging wire claims. The driver of the vehicle involved in the accident testified that a week before the accident he did a pretrip inspection of the intersection for the specific purpose of looking for low hanging wires and did not see a problem. Two experienced CL&P journeymen lineman did not see a problem shortly before the accident, when they drove beneath the wires with a boom truck. Relatedly, they helped free the truck from the wires immediately after the accident. They both testified that they did not what caused the accident.

If two of the Plaintiff's own lineman, with experience in low hanging wires, do not know, what caused the accident, then how does a layperson on a jury determine causation. Therefore causation is beyond the general understanding of a lay jury and expert testimony is required.

It is well established that where a causal link is beyond the knowledge or expertise of a lay jury, "expert testimony is required to establish causation." Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004); see, e.g., Show v. Ford Motor Co., 697 F. Supp. 2d 975, 983 (N.D. Ill. 2010) ("[P]roducts liability cases that involve complex products beyond a lay jury's understanding require expert testimony."), aff'd, 659 F.3d 584 (7th Cir. 2011); Brookshire Bros., Inc. v. Smith, 176 S.W.3d 30, 36 (Tex.

App. 2004) ("When a lay person's general experience and common sense will not enable that person to determine causation, expert testimony is required."); Wilhelm v. State Traffic Safety Comm'n, 230 Md. 91, 185 A.2d 715, 719 (Md. 1962); In re Mirena IUD Prods. Liab. Litig., No. 13-MD-2434 (CS), 2016 U.S. Dist. LEXIS 99221, at *15-*16 (S.D.N.Y. July 28, 2016).

Thus, summary judgment is appropriate where required expert testimony is absent from the record. *See* C.W. ex rel. Wood v. Textron, Inc., 807 F.3d 827, 838 (7th Cir. 2015) (In re Mirena IUD Prods. Liab. Litig., No. 13-MD-2434 (CS)).

See also White v. Mazda Motor of Am., Inc., 139 Conn. App. 39, 49, 54 A.3d 643, 650 (2012). "Connecticut's general rule requires competent expert evidence where the issues involve a question beyond the field of ordinary knowledge and experiences of judges and jurors."

"If the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required." Santopietro v. City of New Haven, 239 Conn. 207, 226, 682 A.2d 106 (1996).

Walters v. Howmedica Osteonics Corp., 676 F. Supp. 2d 44, 52 (D. Conn. 2009)

Here the issue is what is the standard of care relative to inspecting utility wires is a matter for an expert. It is beyond the experience of a jury to know how often a utility company should inspect its wires, or what the inspection should consist of.

Walters v. Howmedica Osteonics Corp., 676 F. Supp. 2d 44, 53 (D. Conn. 2009).

In cases where expert testimony is required for proof of a plaintiff's cause of action, a defendant moving for summary judgment may meet its burden by demonstrating that the plaintiff lacks the requisite expert testimony. See, e.g., Dimmock v. Lawrence &

23

Memorial Hospital, Inc., 286 Conn. 789, 814-15, 945 A.2d 955 (2008); Pekera v. Purpora, 80 Conn.App. 685, 691, 836 A.2d 1253 (2003), aff'd on other grounds, 273 Conn. 348, 869 A.2d 1210 (2005).

Hirschbeck v. Wright Med. Tech., Inc., No. CV055000410S, 2011 Conn. Super. LEXIS 416, at *8 (Super. Ct. Feb. 18, 2011).

The plaintiff's evidentiary dilemma is succinctly articulated in Prosser:

> It is often said that negligence must be proved and never will be presumed. The mere fact that an accident or an injury has occurred, with nothing more is not evidence of negligence on the part of anyone. The fact that a man is found dead upon a railway track after a train has passed is no proof that the train was run without proper care. There is of course, as a matter of speculation, sufficiently interesting in itself, always the possibility that the man may have been killed by reason of negligent operation of the train; but for a decision imposing liability to respond in damages, this is not enough. What is required is evidence, which means some form of proof; and it must be evidence from which reasonable persons may conclude that, upon the whole, it is more likely that the event was caused by negligence than that is was not. As long as the conclusion is a matter of mere speculation or conjecture, or where the probabilities are at best evenly balance between negligence and its absence, it becomes the duty of the court to [find] that the burden of proof has not been sustained. (Prosser on Torts §39 4th Ed. Pg.211).

While the Plaintiff may speculate as to what may have caused the incident, they have not provided any expert testimony in support of that speculation. "Speculation cannot fill the void left by a lack of proof." Moore v. Chesapeake & O.R. Company, 340 U.S. 573, 577 (1951). Therefore, summary judgment is appropriate.

## STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In a motion for summary judgment, the burden is on the

24

moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. Rule 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." See Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (*citation omitted*). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (*quoting* Anderson, 477 U.S. at 248.) The court resolves "all ambiguities and draws all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." See Aldrich, 963 F.2d at 523. Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

When a summary judgment motion is supported by documentary evidence and sworn affidavits, the non-moving party must present "significant probative evidence to create a genuine issue of material fact." See McCarthy v. Armstrong, 2 F. Supp. 2d 231, 231 (D. Conn. 1998) (*internal quotation marks and citations omitted*). Summary judgment should be entered "Against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex, 477 U.S. at 322. Where the non-moving party bears the ultimate burden of proof on an issue, the moving party need

25

only demonstrate the absence of evidence to support an essential element of the non-moving party's claims. *See* Brady v. Town of Colchester, 863 F.2d 205, 210-211 (2d Cir. 1988) (citations omitted). Then, "the burden shifts to the non-moving party to come forward with persuasive evidence that his claim is not 'implausible'." *See* Id. (*citing* Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## CONCLUSION

The aforementioned evidence demonstrates that there are no genuine issues of material fact before the Court and that Verizon is entitled to judgment as a matter of law.

WHEREFORE, the Defendant respectfully requests that this Honorable Court enter an order granting its Motion for Summary Judgment.

*(Remainder of Page Intentionally Left Blank)*

Respectfully Submitted,
Defendant, Verizon New York Inc.,
By its Attorneys,

*/s/ Bruce H. Raymond*

_____

Bruce H. Raymond, ct04981
Raymond Law Group, LLC
90 National Drive, Suite 3
Glastonbury, CT 06033
Tel: (860) 633-0580
Email: Raymond@raymondlawgroup.com


*/s/ Ronald P. Langlois, Esquire*

_____

Ronald P. Langlois, Bar #phv07062
Langlois, Wilkins, Furtado & Metcalf, PC
200 Midway Road, Suite 169
Cranston, RI 02920
Tel: (401) 351-9970
Fax: (401) 274-6218
Email: rlanglois@lwfmlaw.com


Date: January 26, 2017


## CERTIFICATE OF SERVICE

I hereby certify that on this the 26th day of January, 2017, a copy of the Defendant's Memorandum of Law In Support of Its Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties, by operation of the court's electronic filing as indicated on the Notice of Electronic Filing, and as listed below. Parties may access this filing through the Court's CM/ECF System.


Dated: January 26, 2017                    */s/ Ronald P. Langlois*

                                           _____

                                           Ronald P. Langlois


27