## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONNECTICUT LIGHT & POWER CO.,
    Plaintiff,

v.

VERIZON NEW YORK INC.,
    Defendant.

No. 3:14-cv-1152 (SRU)

## RULING AND ORDER

On August 8, 2014, the Connecticut Light and Power Company, doing business as

Eversource Energy ("CL&P"), brought this action against the defendant, Verizon New York, Inc.

("Verizon"). CL&P alleges that, as a result of Verizon's failure to maintain its wires on a jointly-

owned utility pole, Verizon had breached its contractual obligations to CL&P and is thereby

liable for damages CL&P incurred from an accident causing damage to that pole. (doc. 1) CL&P

subsequently filed an amended complaint adding a claim for contractual indemnification. *See*

First Amended Complaint ("FAC") (doc. 29). The parties have now filed cross-motions for

summary judgment. *See* (docs. 60, 62).

For the following reasons, Verizon's motion for summary judgment is granted in part and

denied in part, and CL&P's motion for summary judgment is granted in part and denied in part.

The case will now proceed to trial.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must

present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). Accordingly, when presented with cross-motions for summary judgment, the court must construe the record against each of the parties when considering that party's motion. When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

2

judgment. Factual disputes that are irrelevant or unnecessary will not be
counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory

evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at

248.

If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord*

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim). In short, if there is no genuine issue of material fact, summary

judgment may enter. *Celotex*, 477 U.S. at 323.

## II.    Background

The following facts are taken from the uncontested portions of the parties' Local Rule

56(a)(1) Statements unless otherwise noted. *See* Def.'s L.R. 56(a)(1) Stmt. (doc. 61-1)

[hereinafter "Def.'s 56(a)(1)"]; Pl.'s L.R. 56(a)(1) Stmt. (doc. 61-1) [hereinafter "Pl.'s

56(a)(1)"].

CL&P provides electric service to customers within the state of Connecticut. Verizon

provides telecommunications and cable services in parts of Connecticut, including the Town of

Greenwich, where the relevant events took place. CL&P and Verizon jointly own utility poles in

Greenwich. Their respective predecessors-in-interest entered into an agreement concerning the

rights and responsibilities associated with the jointly-owned poles (the "Joint Pole Agreement"),

which the parties agree governed the pole at issue in this case at the time of the accident. *See* Def.'s 56(a)(1) at ¶ 59, Ex. H; Pl.'s 56(a)(1) at ¶ 4, Ex. 1.

The Joint Pole Agreement provides that one party, chosen by mutual agreement, would act as the "custodian" for each jointly-owned pole, and in that role, would "assume[] responsibility for the inspection, condition and maintenance" of the pole. Joint Pole Agreement, Art. II, (doc. 62-2) at 8; *see also id.*, App'x V, (doc. 62-2) at 23 ("The CUSTODIAN shall arrange to have all JOINTLY OWNED POLES, guys and pole braces in its custody inspected at mutually agreed intervals . . . ."). Regardless of which party served as the custodian for a given pole, the Joint Pole Agreement further provided that "[e]ach party shall maintain in good order and repair at its own expense, its own wires, fixtures and appurtenances on all JOINTLY OWNED poles." *Id.*, App'x VI, (doc. 62-2) at 26.

The Joint Pole Agreement provided a procedure for the replacement of jointly-owned poles as follows: (1) the party proposing the replacement (the "originating party") shall notify the other party of that intention; (2) upon completion of the replacement, the originating party shall provide an executed "Transfer Notice" to the District Engineer of the other party; (3) after the second party transferred its attachments to the new pole, that party shall return the Transfer Notice to the originating party; and (4) the last party to remove its attachments from the old pole will also remove the old pole and repair the sidewalk at its own expense. *Id.*, App'x V, (doc. 62-2) at 24.

The Joint Pole Agreement provides for liability between the parties in Article IX. *Id.*, Art. IX, (doc. 62-2) at 14–16. The introduction to that Article states:

> Whenever liability for damages for injuries to or death of persons other than employees of either party or for damages for injuries to property not belonging to either party arises out of the JOINT USE or joint ownership

4

> of poles, as provided for in this AGREEMENT, the liability for such
> injuries or damage as between the parties hereto shall be as follows . . . .

*Id.* at 14. The first two paragraphs following that introduction explicitly address liability arising from the death or injury of non-employees and damage to property not owned by either party. *Id.* at 14–15. Relevant to the present case, Paragraph E provides:

> If either party has removed its ATTACHMENTS from a pole in connection with a replacement or relocation, and a period of ninety (90) days has elapsed from the date of a Transfer Notice, executed and mailed as provided in Paragraph 3 of Appendix V, the remaining party shall thereafter indemnify and save harmless the vacating party for and from all obligation, liability, damages, costs, expenses or other charges incurred at any time thereafter because of or arising out of the presence, location or condition of such pole or of any ATTACHMENTS of the remaining party thereon irrespective of any negligence on the part of the vacating party arising out of any previous joint ownership or JOINT USE of such pole.[1]

*Id.* at 15–16.

Prior to 2009, the parties jointly owned two poles in Greenwich on either side of Riversville Road—Pole # 69171 and Pole # 71679.[2] Both parties had attachments to both poles, some of which crossed over Riversville Road. Verizon was the designated custodian for both poles. At some time in early 2009, CL&P installed a replacement pole for Pole #71679 and transferred its attachments to the new pole. On or about September 21, 2010, CL&P asserts that it mailed a Transfer Notice to Verizon stating that it had removed its attachments from Pole #71679 and attached them to the replacement pole. *See* Pl.'s 56(a)(1), Ex. 14 (doc. 62-15). Verizon was apparently made aware of the replacement pole at some time before February 2, 2012, but the parties do not agree when or whether the formal Transfer Notice was received. As

---

[1] Paragraph D of Article XI, which concerns liability if one party terminates its ownership in a jointly-owned pole, similarly states that the remaining party shall indemnify the vacating party for "all obligation, liability, damages, costs, expenses, or other charges incurred at any time after" a ninety-day–period following the Termination Notice. Joint Pole Agreement, Art. XI, (doc. 62-2) at 15.

[2] Verizon referred to Pole # 71679 as "Pole 1," but I use the plaintiff's terminology here.

of January 30, 2012, however, Verizon was the only utility that had not yet transferred its attachments from Pole #71679 to the replacement pole.

The accident that set the events of this case into motion occurred on January 30, 2012. On that date, Verizon's cables were the lowest attachments on Pole #69171. Pursuant to the National Electric Safety Code in effect at the time of the accident, Verizon's cables were required to be at least fifteen feet and five inches above the roadway. Nevertheless, a truck measuring twelve feet, four inches at its highest point caught the Verizon cables hung between Pole #69171 and Pole #71679 as the truck was driving along Riversville Road. The snagged cables stressed Pole #69171 and caused it to break. As a result, CL&P's cables and equipment were damaged and CL&P was required to do repair work on Pole #69171 and its attachments.

Prior to the accident, there is no evidence that Verizon had been given specific notice that its attachments between Pole #69171 and Pole #71679 were too low; indeed, Verizon has presented some evidence that both the truck driver at issue and two CL&P technicians in the area did not see any problem with the height of the cables shortly before the accident occurred. The parties have not submitted conclusive evidence regarding what, if anything, caused the cables to sag. The parties also appear to agree that Verizon has not produced any record of inspecting or maintaining Poles # 69171 and #71679 or any of its attachments to those poles, nor has it produced evidence of any policies or procedures in place to ensure that such inspections would occur regularly.

## III.    Discussion

The parties have filed cross-motions for summary judgment, but their motions raise overlapping issues. With respect to the breach of contract claim, I must determine if there is a genuine dispute whether: (1) Verizon breached the contract by failing to conduct maintenance or

inspections or by failing to timely transfer its attachments to the replacement for Pole #71679;
and (2) if Verizon did breach, the amount of damages to which CL&P would be entitled. The
parties' arguments regarding the contractual indemnification count turn on whether there is a
genuine dispute that: (1) the Joint Pole Agreement required a remaining party to indemnify a
transferring party for damage to the transferring party's *own* property after a 90-day notice
period; and (2) if so, whether Verizon failed to transfer its attachments to the new pole within 90
days of receipt of the Transfer Notice. I take up each of those issues in turn.

    A.   <u>Breach of Contract</u>

      Under Connecticut law, "[i]t is well established that the elements of a breach of contract
action are the formation of an agreement, performance by one party, breach of the agreement by
the other party and damages." *Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 185
(2014) (internal citation and quotation marks omitted). The parties here do not dispute that the
Joint Pole Agreement was adequately formed nor that CL&P's performance under said
agreement was adequate.

      CL&P asserts that Verizon breached the agreement by failing to inspect and maintain its
own attachments, by failing to maintain and inspect Pole #69171, and by failing to timely
transfer its attachments to the replacement for Pole #71979. *See* Pl.'s Mot. for Sum. J. Br. at 8;
*see also* Joint Pole Agreement, Art. II (requiring the custodian of a jointly-owned pole to
maintain it); App'x VI (requiring each party to maintain its own attachments); App'x V
(providing the replacement pole protocol). Verizon does not meaningfully contest that the Joint
Pole Agreement required the inspections, nor has it adduced any evidence that those actions were
carried out in a manner that would satisfy the requirements of the agreement. To the extent
CL&P relies on Verizon's failure to timely transfer its wires as the relevant breach, however,

Verizon has raised a genuine issue of material fact regarding when and whether it received the Transfer Notice. CL&P has provided some evidence that Verizon did receive the Transfer Notice prior to the accident, and, as CL&P points out, Verizon's conduct during discovery was troublingly evasive. Nevertheless, CL&P's evidence is not sufficient to remove *any* genuine dispute that Verizon received the Transfer Notice more than 90 days before the accident occurred—that determination will turn in part on the credibility of the CL&P employee who says she sent it and entered it into the computer, and on the Verizon employees who say no such record could be located in their files.

Verizon's main argument is essentially[3] that CL&P is not entitled to damages as a matter of law because CL&P has failed to put forward adequate evidence on causation. "The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." *Ambrogio v. Beaver Rd. Assocs.*, 267 Conn. 148, 155 (2003) (internal quotation marks and citation omitted). Contractual damages are generally divided into

---

[3] Verizon argues that CL&P's breach of contract claim is, in fact, a mischaracterized negligence claim, and asserts that claim must fail for lack of evidence on the issues of notice and causation. Def.'s Mot. for Sum. J. Br. at 17–19. Many of the cases it cites suggesting that distinction is significant involve plaintiffs seeking to extend the statute of limitations period by making a claim under contract as opposed to tort law, which is not an issue in this case. *See, e.g.*, *Gazo v. City of Stamford*, 255 Conn. 245, 266 (2001) ("[T]he only practical difference between the plaintiff's negligence and contract claims is that different statutes of limitations would apply to the two claims."); *Barnes v. Schlein*, 192 Conn. 732, 735 (1984) (discussing the appropriate statute of limitations); *Shuster v. Buckley*, 5 Conn. App. 473, 477 (1985) (same). The plaintiffs in the remaining cases failed to adequately allege any contractual duty at all that could have been breached. *See, e.g.*, *Rumbin v. Baez*, 52 Conn. App. 487, 491 (1999) ("The plaintiff's substitute complaint contains no allegation of a breach of a contractual duty owed to him."); *DiMaggio v. Makover*, 13 Conn. App. 321, 323 (1988) ("[The plaintiff's] complaint is absolutely barren of any allegation that the defendant breached any contractual duty owed to her."). In the present case, by contrast, CL&P has adequately alleged a contractual duty and several breaches; accordingly, there is no need to consider the merits or timeliness of a negligence claim.

Verizon is also incorrect in asserting that CL&P cannot recover property damages in a breach of contract claim. Instead, its arguments regarding notice and causation are best understood as going to whether CL&P has adequately established contractual damages, which inherently include an *element* of causation.

two categories: "(1) direct damages, composed of 'the loss in value to him of the other party's performance caused by its failure or deficiency,'" *id.* (quoting 3 Restatement (Second), Contracts § 347 (1981)); and (2) consequential damages, which traditionally include "any loss that may fairly and reasonably be considered as arising naturally, i.e., according to the usual course of things, from such breach of contract itself," *id.* (internal quotation marks and citation omitted); *see also Calig v. Schrank*, 179 Conn. 283, 286 (1979) ("It is hornbook law that to be entitled to damages in contract a plaintiff must establish a causal relation between the breach and the damages flowing from that breach."); *Meadowbrook Ctr., Inc.*, 149 Conn. App. at 185 (collecting cases holding that causation is an element of contractual damages).

Causation in the contracts context is narrower than what would be sufficient for a claim sounding in tort. *See Meadowbrook Ctr., Inc.*, 149 Conn. App. at 188 (discussing that distinction, as explained by *Neiditz v. Morton S. Fine & Associates, Inc.*, 199 Conn. 683 (1986)). As indicated by the traditional definition of consequential damages quoted above, "the causation standard applicable to breach of contract actions asks not whether a defendant's conduct was a proximate cause of the plaintiff's injuries, but rather whether those injuries were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct." *Id.* at 188–89. Damages attributable to intervening causes cannot be recovered in a breach of contract action. *See Prince v. Control Sys., Inc.*, 2007 WL 2390401, at *5 (Conn. Super. Ct. July 24, 2007) (citing *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 525–26 (2d Cir. 2004)).

CL&P does not move for summary judgment on the issue of damages, and neither party has squarely presented a discussion of direct and consequential damages. Nevertheless, it is clear that the dispute in this case is over whether Verizon's breaches were the natural and direct cause

9

of CL&P's losses.[4] Low-hanging cables are clearly a foreseeable risk of a complete failure to inspect or maintain those cables or the poles to which they were attached, and those low-hanging cables, in turn, are dangerous precisely because they can cause the kind of accident and resulting costs that occurred in the present case. But the foreseeability of this *type* of accident does not, on its own, resolve the issue. The contractual causation standard also requires a showing that the plaintiff's damages directly resulted from the breach, rather than from any intervening cause. *See Meadowbrook Ctr., Inc.*, 149 Conn. App. at 188; *Prince*, 2007 WL 2390401, at *5.

The bulk of Verizon's argument is aimed at showing that CL&P has failed to provide sufficient evidence ruling out any intervening causes. It argues that it had no prior notice of low-hanging cables, and points out that both the truck driver involved in the accident and two CL&P technicians in the area did not notice that Verizon's cables were too low shortly before the accident occurred. Def.'s Mot. For Sum. J. Br. at 20–21. As CL&P points out, however, the CL&P technicians had no obligation to inspect Verizon's cables, and the truck-driver did not notice the cables were too low even when he drove underneath them and caused this accident. Pl.'s Opp'n Br. at 17. The parties have raised a genuine issue of fact regarding causation— viewing the record in the light most favorable to CL&P, there is no direct evidence of an intervening cause for the sagging cables, and without any inspections by Verizon, there is no wholly reliable record of when the cables may have begun to sag; but viewing the record in the light most favorable to Verizon, the failure of several parties to notice any problem leading up to the accident suggests that a sudden, intervening event may have caused the wires to sag.

---

[4] To clarify a few points raised by CL&P's opposition brief, the dispute here does not appear to turn on whether Verizon was justified in its breach, *see* Pl.'s Opp'n Br. at 17 (quoting *Entin v. City of Bristol*, 368 F.2d 695, 701 (2d Cir. 1966)); nor is the proper standard whether Verizon's breach *proximately* caused CL&P's damages, *see* Pl.'s Opp'n Br. at 18—instead, CL&P has the burden to show that Verizon's breaches were the "natural and direct" cause of its losses absent any significant intervening cause.

Separately, I note that although neither party raised the issue, in contract cases, "the party receiving a damage award has a duty to make reasonable efforts to mitigate damages. What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier." *Vanliner Ins. Co. v. Fay*, 98 Conn. App. 125, 145 (2006) (internal quotation marks and citation omitted). There is some indication in the record before me that CL&P was on notice of Verizon's putative breaches long before the accident occurred and failed to take any steps to avoid the risks caused thereby. For instance, to the extent CL&P is arguing that its damages were caused by a failure to inspect the jointly-owned poles, the Joint Pole Agreement provides that the custodian of a jointly-owned pole shall arrange to have that pole inspected "mutually agreed intervals." Joint Pole Agreement, App'x V (doc. 62-2) at 23. There is no evidence in the record that CL&P ever requested such inspections or believed them to be occurring prior to the accident; accordingly, it appears that CL&P should have been on at least inquiry notice of Verizon's breach long before the accident occurred. In the same vein, to the extent that CL&P is arguing that its damages were caused by Verizon's failure to timely transfer its cables and remove the old pole, the Joint Pole Agreement provides that the recipient of a Transfer Notice should receive notice of the transferring party's intent to transfer before that work occurs, and should return the Transfer Notice to the originating party after the recipient completed the transfer of its own attachments. *Id.*, App'x V, (doc. 62-2) at 24. There is no evidence in the record that CL&P sought a return of the Transfer Notice at any time after September 1, 2010 or believed it had received such a return. It is unclear to me that after it was on at least inquiry notice of Verizon's breaches, CL&P was entitled to simply wait for an accident to occur as a result of those breaches.

I thus **deny** Verizon's motion for summary judgment on the breach of contract claim, and I **grant** CL&P's motion for summary judgment on the issue of liability only insofar as I hold there is no genuine dispute that there was a contract and that Verizon breached that contract by failing to inspect its own cables or the jointly-owned poles for which it was the custodian. The question of appropriate damages, however, remains contested.

### B. Contractual Indemnification

CL&P also asserts that the Joint Pole Agreement entitles it to indemnification as a result of Verizon's failure to timely transfer its attachments from Pole #71679. When analyzing a contract under Connecticut law, a court must look at the contract as a whole and give operative effect to all of its provisions. *See Nat'l Grange Mutual Ins. Co. v. Santaniello*, 290 Conn. 81, 89 (2009). "Analysis of the contract focuses on the intention of the parties as derived from the language employed." *Levine v. Advest, Inc.*, 244 Conn. 732, 745 (1998) (collecting cases holding same). "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to that intent." *See id*. at 746 (collecting cases). Language in a contract is unambiguous if "it has a definite and precise meaning concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal quotation marks and citation omitted). As a general matter, parties are bound by unambiguous language in a written contract regardless of whether they actually read or understand that language when they sign it. *See Friezo v. Friezo*, 281 Conn. 166, 199 (2007). Where, like in the present case, "the intention of the parties is to be determined without reference to extrinsic evidence, interpretation of the contract is a matter of law." *Levine*, 244 Conn. at 746.

Verizon makes two arguments against contractual indemnification. First, it asserts that the language in Appendix VI of the Joint Pole Agreement requiring each party to "maintain in

good order and repair at its own expense, its own" attachments to jointly-owned poles

"demonstrates an intent to eliminate litigation between the parties." Def.'s Mot. For Sum. J. Br.

at 16.[5] In support of that argument, however, Verizon takes the phrase "repair at its own

expense" out of context—as CL&P points out, "good order and repair" is a commonly-used

phrase in many contexts that does not reasonably give rise to ambiguity. *See, e.g.*, *Carano v.*

*Kabadi*, 2014 WL 4413267, at *6 (Conn. Super. Ct. July 22, 2014) (agreement required a

hospital to "keep and maintain all equipment in good order and repair"); *Fishman v. Vantage*

*Point Ass'n, Inc.*, 2009 WL 567064, at *6 (Conn. Super. Ct. Feb. 11, 2009) (condominium

association agreement required members to keep their units "in good order and repair"); *Tire*

*Shop v. Peat*, 115 Conn. 187, 187 (1932) (agreement required purchaser of a car to maintain it

"in good order and repair"). And even if the phrase was ambiguous, Verizon's reading would

still overreach—it is hard to imagine two sophisticated parties quietly slipping a term as

significant as an agreement to forgo an entire category of lawsuits into an Appendix entitled the

"Division of Maintenance Costs," rather than one devoted to liability, waivers, and damage.

Second, Verizon argues that the Transfer Notice indemnification clause located in Article

IX is limited to claims made by third parties. CL&P points out that, unlike other provisions in

that Article, the text of the indemnification clause itself includes broad language. *See* Pl.'s Opp'n

Br. at 19; however, the introduction to Article IX makes clear that the entire Article contemplates

only claims brought by third parties. *See* Art. IX, (doc. 62-2) at 14 (stating that whenever liability

for damages for injuries to third parties and third-party property arises out of jointly owned

poles, "the liability for such injuries or damage as between the parties hereto shall be as follows .

---

[5] CL&P understood Verizon to be arguing that clause also forecloses breach of contract claims for the cost of damages to each parties' own equipment. Regardless, my analysis of the clause remains the same.

. . .”). In light of that introduction, there was no need for the drafters of Joint Pole Agreement to repeat language limiting the Transfer Notification indemnification clause to third-party claims.

Thus, because CL&P's indemnification claim relies on the Transfer Notification indemnification clause, which applies only to third-party claims, I grant Verizon's motion for summary judgment on that claim.

## IV.    Conclusion

Verizon's motion for summary judgment is granted in part with respect to the contractual indemnification claim, and denied in part with respect to the breach of contract claim. CL&P's motion for summary judgment on the issue of liability on the breach of contract claim is granted in part with respect to Verizon's admitted breaches of the Joint Pole Agreement by failing to inspect and maintain, but denied with respect to allegations that Verizon breached by failing to timely transfer its attachments.

The case will proceed to trial on the following issues: (1) whether Verizon's failure to transfer its attachments was a breach of contract; (2) whether any of Verizon's breaches was the direct and natural cause of CL&P's foreseeable losses; and (3) whether CL&P failed to mitigate its losses.

So ordered.

Dated at Bridgeport, Connecticut, this 23rd day of February 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

14